RON BENDER (SBN 143364)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  rb@lnbyb.com; kjm@lnbyb.com

Proposed Counsel for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

### Southern District of California

| | |
|---|---|
| In re: | Case No. 10-15142-LT11 |
| CITIZENS DEVELOPMENT CORP., | Chapter 11 |
| Debtor and Debtor in Possession. | |
| | **DEBTOR'S EMERGENCY FIRST DAY MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | **[Omnibus Declaration Of Matthew C. DiNofia In Support Of Debtor's Emergency First Day Motions Filed Concurrently Herewith]** |
| | [No Hearing Required] |

Pursuant to Local Bankruptcy Rule 9014-5, Local Guidelines for First Day Motions, and Sections 363(c) and 361 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Citizens Development Corp., the debtor and debtor in possession in the above-entitled Chapter 11 bankruptcy case, hereby moves, on an emergency basis (the "Motion"), for the entry of an interim order (the "Interim Order") authorizing the Debtor to use cash collateral on an interim basis pending a final hearing in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as Exhibit "1" to the annexed Declaration of Matthew C. DiNofia (the "DiNofia Declaration").  A description of the Budget is set forth below in the annexed Memorandum of Points and Authorities.

On August 26, 2010 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is the owner, either directly or through its affiliates, and operator, of the Lake San Marcos Resort and Country Club (the "Resort") located on the shores of the 80-acre Lake San Marcos, in San Diego County, approximately 30 miles north of San Diego.  The Resort is comprised of 252 acres of land that includes a 139-room hotel, 18,300 square feet of meeting and banquet space, a private 18-hole championship golf course with clubhouse and pro-shop, a public 18-hole executive golf course, three restaurants, a fitness center, tennis courts, outdoor swimming pools and the 80-acre Lake San Marcos.

While the Resort is a single Resort operated by the Debtor, the various above-described components of the Resort are owned separately by various Resort Entities.  The Resort Entities include: the Debtor, LSM Country Club LLC ("Country Club"), LSM Hotel LLC ("Hotel") and LSM Executive Course LLC ("Executive Course").  The Debtor wholly owns Country Club and Hotel.  Executive Course is directly owned by Matthew C. DiNofia, who is also the President and

sole shareholder of the Debtor.  Hotel and Executive Course are currently Chapter 11 debtors in possession in separate bankruptcy cases pending before this Court, Case Nos. 10-13024-LT11 and 10-07480-LT11, respectively.

The Resort Entities are inseparably related to one another, with the Debtor as the "hub" of all of the Resort Entities.  The Resort Entities share bank accounts, all in the name of the Debtor (except for the debtor-in-possession accounts that have recently been opened by Hotel and Executive Course), employees (all of whom are the Debtor's employees), revenues, and expenses (for example, all invoices are billed directly to the Debtor, even though they may be for expenses incurred by another of the Resort Entities).  Cash flow shortfalls experienced by a Resort Entity are typically alleviated by applying to those shortfalls the revenue generated by another of the Resort Entities.

It is almost impossible to envision the Resort Entities as separate and distinct entities due to the interrelatedness of their operations, their ownership structure, business model, physical and financial connectivity of assets, and overall relationship with each other.  Separately, the Resort Entities would be almost entirely non-functional and their respective assets standing alone would be significantly less valuable than as a whole.  In order for the Resort to operate with any success, the Resort Entities are required to operate in unison, like a single entity.  The Debtor intends to file a motion to substantively consolidate the Resort Entities either concurrently herewith or shortly after the filing of this Motion.

The Debtor directly owns approximately 100 acres of land, upon which exist an 80 acre man-made lake known as Lake San Marcos, two signage parcels approximately 5,000 square feet each, and certain other land adjacent to the Lake, and park land adjacent to the Lake.  The Debtor is also the owner of Quail Restaurant which is currently not operating, and a Recreation Center which generates funds for the Debtor by way of customer payments of annual membership fees and the provision of various other services.  The Debtor also owns certain water rights which the Debtor believes are not encumbered by any liens or other claims.  The Debtor believes that the following creditors may assert an interest in the Debtor's cash collateral:  D&A Semi Annual

Mortgage Fund III, LC; Telesis Community Credit Union; and Pacific West TD Fund II, LP.  Of these creditors, Telesis Community Credit Union will likely assert an interest in the revenues generated by the Recreation Center, which is the only asset (not including the Resort Entities ) of the Debtor that is currently generating income for the Debtor.

The Debtor must be able to use the revenue it generates (essentially revenue from the Recreation Center) in order to pay post-petition operating expenses, including, but not limited to, insurance, utilities, and maintenance expenses, all of which are necessary to maintain the Debtor's assets and the Debtor's going concern value.  Failure to pay these expenses would likely lead to a diminution in the value of the assets, as well as a loss of business which would reduce income.  All of the foregoing would cause substantial harm to the Debtor's estate and its creditors.  In short, in order for the Debtor and the Resort Entities to be able to operate the Resort while the Debtor is in Chapter 11, and to avoid immediate and irreparable harm to the Debtor's business and assets, the Debtor must be able to use its cash collateral to pay post-petition operating expenses to the extent possible.  The Debtor recognizes that it has budget shortfalls at this time, but the Debtor intends to address such shortfalls by requesting the Court, in a subsequent motion, to substantively consolidate the Resort Entities, so that the overall revenue and expense streams of the Resort Entities as a whole will be more balanced.[1]  Additionally, the Debtor can receive assistance from Country Club, to the extent necessary, in respect of remaining current with its obligations.  Nevertheless, for the time being, and pending such a potential substantive consolidation, the Debtor still requires authority to use cash collateral.

The Debtor's proposed Budget, a copy of which is attached as Exhibit "1" to the annexed DiNofia Declaration, contains the expenses the Debtor believes must be paid in order for the Debtor to operate and preserve the value of its business.

---

[1]    The Debtor recognizes that Hotel and Executive Course are currently in pending bankruptcy cases, and that the use of revenues from Hotel and Executive Course is subject to Court orders in those respective cases.  The Debtor will not utilize such revenues for payments of expenses discussed herein inconsistent with any Court orders in those cases, but the Debtor will seek to substantively consolidate all of the Resort Entities so as to alleviate the organizational quagmire which is caused by keeping the Resort Entities separate when their operations and organization are inseparably intertwined.

Emergency Cash Collateral Motion            3

The Debtor believes that to the extent that any of the above-referenced creditors do have an interest in the Debtor's cash collateral, they are adequately protected. The Debtor also believes that the value of its assets is not declining. As further adequate protection, the Debtor also proposes to provide the any such creditor with an actual lien (a "Secured Lender") on the Debtor's cash collateral with a replacement lien against the Debtor's assets, with such replacement lien to have the same extent, validity, and priority as the pre-petition lien held by such creditor.

Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing on this Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtor to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing.

Here, the Debtor cannot survive 14 days without any use of cash collateral. The Debtor must be able to pay expenses in accordance with the Budget pending a final hearing in order to avoid immediate and irreparable harm to the Debtor's business and this bankruptcy estate.

Pursuant to Local Rules and Guidelines in respect of motions to use cash collateral, the Debtor makes the following statements regarding the relief requested by the Debtor pertaining to the Debtor's use of cash collateral and the proposed order submitted concurrently:

| Description of Provision | Page No. /Line No. |
| --- | --- |
| Cross-collateralization clauses | No, except to the extent that a Secured Lender is already cross-collateralized, such cross-collateralization shall also apply to any replacement liens granted herein. |

| Description of Provision | Page No. /Line No. |
|---|---|
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's lien or debt. | No |
| Provisions that seek to waive rights under 11 U.S.C. § 506(c) | No |
| Provisions that grant immediately to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C.§§ 544, 545, 547, 548, and 549 | No |
| Provisions that "roll over" prepetition debt of the prepetition secured creditor to post-petition debt | No |
| Provisions which provide carveouts for administrative expenses that do not treat all professionals equally or on a pro rata basis | No |
| Provisions that operation, as a practical matter, to divest the debtor-in-possession of any discretion in the formulation of a plan or administration of the estate or limit access to the court to seek any relief under other applicable provisions of law | No |

## ADDITIONAL INFORMATION

Pursuant to Rule 4001(b)(1)(C) of the Federal Rules of Bankruptcy Procedure, the Debtor is required to serve a copy of this Motion on any entity with an alleged interest in the Debtor's cash collateral, any committee appointed or on the twenty largest unsecured creditors if no committee has been appointed, and any other entity that the Court directs.  The Debtor has complied with the foregoing by serving notice of this Motion upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the Debtor's twenty (20) largest unsecured creditors, and other parties in interest via email transmission and facsimile transmission (to the extent that email or facsimile contact information was available).  Moreover, the Debtor served a copy of this Motion and all supportive papers upon the aforementioned parties on September 1, 2010 by overnight mail.  Such parties should receive delivery by overnight mail of the notice of the Motion, the Motion and all supporting documents by not later than the morning of September 2, 2010.

The relief sought in this Motion is based upon this Motion, the annexed Memorandum and DiNofia Declaration in support of this Motion, the statements, arguments and representations of counsel to be made at the hearing on this Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1. granting this Motion on an interim basis pending a final hearing pursuant to the proposed order attached hereto as Exhibit "A";

2. authorizing the Debtor to use cash collateral to pay all of the expenses set forth in the Budget on an interim basis pending a final hearing and authorizing the Debtor to deviate from the figures in the Budget by up to 15%, both on a line item and aggregate basis;

3. setting a final hearing on this Motion; and

4. granting such other and further relief as the Court deems just and proper.

Dated: September 1, 2010                         CITIZENS DEVELOPMENT CORP.


                                                 By:    /s/Krikor J. Meshefejian
                                                        RON BENDER
                                                        KRIKOR J. MESHEFEJIAN
                                                        LEVENE, NEALE, BENDER, YOO
                                                        & BRILL L.L.P.
                                                        Proposed Counsel for Debtor and
                                                        Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF FACTS

**A.    Bankruptcy Filing.**

1.    On August 26, 2010 (the "Petition Date"), Citizens Development Corp. a California corporation, the debtor and debtor in possession herein (the "Debtor"), filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code").  The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.    The Debtor's Ownership Structure and Operations.**

2.    The Debtor is the owner (either directly or through its affiliates), and operator, of Lake San Marcos Resort & Country Club (the "Resort").  The Resort is located on the shores of the 80-acre Lake San Marcos, in San Diego County, approximately 30 miles north of San Diego. The Resort is comprised of 252 acres of land that includes a 139-room hotel, 18,300 square feet of meeting and banquet space, a private 18-hole championship golf course with clubhouse and pro-shop, a public 18-hole executive golf course, three restaurants, a fitness center, four tennis courts, two outdoor swimming pools and the 80-acre Lake San Marcos.

3.    While the Resort is a single Resort operated by the Debtor, the various above-described components of the Resort are owned separately by various Resort Entities.  The Resort Entities include: the Debtor, LSM Country Club LLC ("Country Club"), LSM Hotel LLC ("Hotel") and LSM Executive Course LLC ("Executive Course").  The Debtor wholly owns Country Club and Hotel.  Executive Course is directly owned by Matthew C. DiNofia, who is also the President and sole shareholder of the Debtor.  Hotel and Executive Course are currently Chapter 11 debtors in possession in separate bankruptcy cases pending before this Court, Case Nos. 10-13024-LT11 and 10-07480-LT11, respectively.

4.    The Resort Entities are inseparably related to one another, with the Debtor as the "hub" of all of the Resort Entities.  The Resort Entities share bank accounts, all in the name of the Debtor (except for the debtor-in-possession accounts that have recently been opened by Hotel and

Executive Course), employees (all of whom are the Debtor's employees), revenues, and expenses (for example, all invoices are billed directly to the Debtor, even though they may be for expenses incurred by another of the Resort Entities). Cash flow shortfalls experienced by a Resort Entity are typically alleviated by applying to those shortfalls the revenue generated by another of the Resort Entities.

5.     It is almost impossible to envision the Resort Entities as separate and distinct entities due to the interrelatedness of their operations, their ownership structure, business model, physical and financial connectivity of assets, and overall relationship with each other. Separately, the Resort Entities would be almost entirely non-functional and their respective assets standing alone would be significantly less valuable than as a whole. In order for the Resort to operate with any success, the Resort Entities are required to operate in unison, like a single entity.

6.     The Resort Entities, including the Debtor, are already so closely related and intertwined that from an operational and business structure standpoint, there is no real separation between the Resort Entities. As a practical matter, it would be impossible to keep the Resort Entities as separate, stand-alone entities each with its own separate business. This is why the Resort Entities are owned either directly or indirectly, by a single person. The proper and effective management and operation of the Resort depends in large part upon the ability of the various Resort Entities to work in unison and collectively, which is why separate, unrelated ownership for each Resort Entities and/or its assets would be difficult to sustain. The Debtor believes that, given these facts, substantive consolidation of the Resort Entities would be appropriate. The Debtor will file a motion to substantively consolidate the Resort Entities.

**C.     The Debtor's Assets and Debt Structure.**

7.     Aside from the Debtor's ownership interests in Hotel and Country Club, the Debtor directly owns approximately 100 acres of land, upon which exist an 80 acre man-made lake known as Lake San Marcos (the "Lake"), two signage parcels (the "Signage Parcels") approximately 5,000 square feet each, and certain other land adjacent to the Lake (the "Lakefront Land"), and park land adjacent to the Lake ("Park Land"). The Debtor is also the owner of Quail

Restaurant (the "Restaurant") and a recreation center (the "Recreation Center"). The Debtor also owns certain water rights (the "Water Rights"), as described below.

**a.    _The Restaurant Property._**

8.    The Debtor's Restaurant property is located at 1035 La Bonita Drive, Lake San Marcos, California. The Restaurant, currently not operating, is a 150-seat full service lakefront restaurant with dramatic 20-foot floor-to-ceiling windows showcasing the Lake. Due to lack of business, the Restaurant ceased operations in January 2009. The Debtor has attempted to find a tenant to lease the Restaurant space and pay rent to the Debtor, but has had difficulty attracting a tenant willing to occupy and pay rent for the Restaurant property. The Debtor continues to search for a tenant to occupy the Restaurant. At times, Country Club utilizes the Restaurant to host events. Overall, the revenue generated by the Restaurant (currently zero), is not adequate to pay for the monthly debt service, tax, insurance and other expenses incurred by Restaurant.

9.    The Restaurant is encumbered by a first deed of trust in favor of D&A Semi Annual Mortgage Fund III, LC ("D&A") securing a claim in the approximate amount of $1 million, pursuant to a loan which the Debtor obtained from Dunham in the original principal sum of $1 million (the "First D&A Loan"). The First D&A Loan matured in March 2009, and the Debtor has been unable to repay the First D&A Loan either directly or through a refinancing.

10.    The Restaurant is also encumbered by a second deed of trust in favor of D&A securing a claim in the approximate amount of $550,000, pursuant to a loan which the Debtor obtained from Dunham in the original principal sum of $500,000 (the "Second D&A Loan"). The Second D&A Loan also matured in March 2009, and the Debtor has been unable to repay the First D&A Loan either directly or through a refinancing. The Debtor believes that D&A may assert that it possesses a security interest in any cash generated by the Restaurant property.

**b.    _The Recreation Center Property._**

11.    The Recreation Center includes a 3,388 square foot conference center with 15-foot ceilings that can accommodate up to 400 guests. The Recreation Center also provides amenities for surrounding homeowners and hotel guests, including swimming pools, tennis, boat rentals,

and fishing.  The Debtor generates income primarily from the following: (1) payments of assessments by homeowners and homeowners associations which enter into leases with the Debtor for the use of the Lake and Recreation Center facilities (there are currently between 800-900 such leases); and (2) payments of fees from groups and other parties that lease conference space for conferences and various other types of events.  Assessments are the primary source of revenue for the Recreation Center.  Assessments are collected twice per year, and as a result of the interrelatedness of the Resort Entities, are typically utilized to pay expenses of the Resort Entities as such assessments are collected, therefore leaving the Recreation Center with budget shortfalls during the course of the year.

12.     The Recreation Center is encumbered by a first deed of trust in favor of Telesis Community Credit Union ("Telesis") securing a claim in the approximate amount of $4,800,000 pursuant to a loan which the Debtor obtained from Telesis in the original principal sum of $4,740,000 (the "Telesis Loan").  The Telesis Loan matured in August 2009, and the Debtor has been unable to repay the First Dunham Loan either directly or through a refinancing.  In April 2010, Telesis filed a lawsuit against the Debtor seeking to collect on the alleged debts owed to Telesis by the Debtor (the "Telesis Action").  The Telesis Action was filed in the Superior Court for the State of California, County of San Diego, Case No. 37-2010-00090427-CU-BC-CDL.  Telesis and the Debtor have subsequently entered into a forbearance agreement which has essentially stayed the Telesis Action, but there currently is no permanent or long-term resolution with respect to the Telesis Loan.  The Debtor believes that Telesis may assert that it possesses a security interest in any cash generated by the Recreation Center.

c.     *The Lake and Lakefront Land.*

13.     The Lake and Lakefront Land comprise of approximately 110 acres, with the Lakefront Land comprising approximately 30 acres of that total amount.  The Lakefront Land is currently undeveloped.  The Lake offers various recreational activities such as boating, where

resort guests can rent boats.[2]  Such rentals generate income for the Debtor and such income is reflected in the Budget for the Recreation Center which Budget is included in Exhibit 1 to the DiNofia Declaration.  The Lake and Lakefront Land are encumbered by a first deed of trust in favor of Pacific West TD Fund II, LP ("Pac West") securing a claim in the approximate amount of $2,800,000 pursuant to a loan which the Debtor obtained from Pac West in the original principal sum of $2,800,000 (the "Pac West Loan").  The Pac West Loan matured in August 2009, and is cross-collateralized against other assets owned  by various entities owned or controlled by Mr. DiNofia.  The Debtor believes that Pac West may assert a security interest in any cash generated by the Lake and/or the Lakefront Land.

### d.   *The Signage Parcels*.

14.     The Signage Parcels consist of two approximate 5,000 square feet each pieces of real property located on the corner of Rancho Santa Fe Road and Lake San Marcos Road.  The Signage Parcels provide major-thoroughfare exposure and signage for the Resort.  The Signage Parcels are encumbered by a first deed of trust in favor of Chris DiNofia ("Chris") securing a claim in the approximate amount of $250,000 pursuant to a loan agreement which authorizes the Debtor to borrow up to $2,000,000 from Chris.  This loan matures in August 2012.

### e.   *Park Land*.

15.     The Debtor owns approximately 8,000 square feet of Park Land adjacent to the Lake which is unencumbered land.

### f.   *Water Rights*.

16.     The Debtor has been the long-time owner of various water rights which permit the Debtor to pump water from the Lake.  This is a significant asset given that the water is utilized to service the Debtor's affiliates' golf courses.  It is necessary, of course, for the golf courses to have access to water.  Without access to the Lake water, the golf courses would have to find an

---

[2]   The Debtor is, and has been for more than a year, involved in various disputes with governmental and environmental agencies regarding the Lake and its environmental impact. These issues have negatively affected the Debtor's business operations.

alternative source of water, which would be prohibitively expensive for the golf courses owned by the Debtor's affiliates.

**D.**     **Summary of the Circumstances that Led to the Filing of the Debtor's Chapter 11 Case.**

17.    The hospitality and leisure activity industries have experienced a major decline in revenues during the current, ongoing, economic recession.  For the Debtor and its affiliates, such a decline began in August-September 2008.  Since that time, the Debtor's and its affiliates' revenues have decreased by more than fifty percent (50%).  The Debtor has been forced to shut down its Restaurant operations, and has been unable to find a tenant to replace the Debtor's operations at the Restaurant.  During that time, while the Debtor's revenues continued to decrease, most of the Debtor's secured debt obligations came due, but the Debtor has not been able to obtain alternative financing.  Coupled with these financial problems, the Debtor and its affiliates face significant competition from multiple new golf courses and hotels in an extremely competitive industry.  As financial pressure has mounted against the Debtor and its affiliates, the Debtor and certain of its affiliates such as Hotel and Executive Course have filed for Chapter 11 protection to preserve estate assets and attempt to collectively restructure their debt obligations so as to be able to effectively compete in the marketplace going forward.

**E.**     **The Debtor's Need for Use of Cash Collateral and Proposed Operating Budget.**

18.    The Debtor must be able to use the revenue generated from its operations in order to pay post-petition operating expenses, including, but not limited to, insurance, employees, utilities, and maintenance expenses, all of which are necessary to maintain the Debtor's operations and the Debtor's going concern value.  Failure to pay these expenses would likely lead to a loss of business, which would reduce income and cause substantial harm to the Debtor's estate and its creditors.  In short, in order for the Debtor to be able to operate its business (including managing and running its affiliates' businesses) while in Chapter 11 and to avoid immediate and irreparable harm to its business and operations, the Debtor must be able to use its cash collateral to pay post-petition operating expenses.  While the revenues generated by the Debtor's directly owned assets such as the

Restaurant and Recreation Center are not sufficient to cover all of the Debtor's expenses, such revenues are still needed to address, to the extent possible, the Debtor's expenses.  The Debtor believes that substantively consolidating the Resort Entities will assist in addressing any cash flow shortage it is experiencing, which shortage, prior to the filing of this bankruptcy case and the Executive Course and Hotel bankruptcy cases, would have been addressed by combining the overall revenues of the Resort Entities anyway.  Without such consolidation, the Debtor's and the Resort Entities' use of funds while the Debtor, Executive Course and Hotel are in bankruptcy, given that the Resort Entities share funds and expenses, will be problematic and extremely complicated, if not impossible.  In the interim, to address any cash flow shortfalls, Country Club, which at times utilizes the Restaurant space to generate revenue, to the extent necessary, can assist the Debtor in remaining current with its obligations.

19.    The Debtor's proposed Budget, a copy of which is attached as Exhibit "1" to the annexed Declaration of Matthew C. DiNofia (the "DiNofia Declaration"), contains the expenses the Debtor believes must be paid in order for the Debtor to operate and preserve the value of its business.  The Budget discloses revenues and expenses on a weekly basis through November 2010. However, the revenues disclosed by the Recreation Center, particularly revenues from association dues, are allocated on a monthly basis, even though the Debtor receives such revenues only twice per year.  As a result of expending most if not all of such revenues already, the Debtor currently experiences significant budget shortfalls which, with the assistance of other Resort revenues (those unrelated to Hotel and Executive Course), the Debtor can address, while its substantive consolidation motion is pending.  The expenses contained in the Budget are necessary to enable the Debtor to avoid immediate and irreparable harm to the Debtor's bankruptcy estate, because by not paying these expenses, the Debtor runs to risk of, among others, losing the ability to further obtain such services, and the risk of deterioration of its assets if the Debtor cannot maintain its assets.

# II.

## DISCUSSION

**A.**   **The Debtor Must Be Authorized To Use Cash Collateral to Operate, Maintain and Preserve Its Business and the Property in Accordance with the Budget.**

The Debtor's use of property of its estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section . . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) allows the use of "cash collateral" under subsection (c)(l) if:

> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (B.A.P. 9th Cir. 1991).  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

1  collateral is necessary to operate a business." In re Dynaco Corporation, 162 B.R. 389 (Bankr.

2  D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

3      The only sources of revenue available to the Debtor to use to operate, maintain and

4  preserve its business are the Debtor's cash existing on the Petition Date and post-petition

5  revenues from the operation of the Resort.  As a result, the Debtor has no ability to continue to

6  operate its business and maintain and preserve the going concern value of its business unless the

7  Debtor has immediate access to, and use of, its cash, including, but not limited to, insurance, real

8  estate taxes, salaries and wages, utilities, and maintenance expenses.

9      The expenses the Debtor must be able to pay during the initial interim period of this

10 Chapter 11 bankruptcy case are set forth in the Budget documents attached to the DiNofia

11 Declaration.  While the Debtor does not generate enough revenue to cover all such expenses, the

12 Debtor does generate some revenue, and while the Debtor attempts to substantively consolidate

13 the Resort Entities, the Debtor will need Court authorization to pay the expenses it is capable of

14 paying using the cash collateral of its lenders (which the Debtor believes will most likely be

15 limited to Telesis since the only source of revenue for the Debtor other than from other Resort

16 Entities which are not in bankruptcy, currently, is the Recreation Center).  The Debtor's inability

17 to pay those expenses would cause immediate and irreparable harm to the Debtor, its operations,

18 and this bankruptcy estate.  Indeed, the Debtor's inability to pay basic and critical operating

19 expenses such as payroll, utilities, and insurance would prevent the Debtor from operating its

20 business and the Resort and would likely result in the loss of income.  Failure to continue

21 operations and provide the services Resort guests and customers are accustomed to receiving and

22 expect to receive may also subject the Debtor's business to harm.  All of the foregoing would

23 cause substantial harm to the Debtor's estate and its creditors.

24 **B.    Any Creditors with an Interest in the Debtor's Cash Collateral are Adequately**

25 **Protected by the Debtor's Continued Use Of Cash Collateral.**

26      To the extent that an entity has a valid security interest in the revenues generated by

27 property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

28

1    Code.    Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

2    creditor's cash collateral if the secured creditor is adequately protected.    In re Mellor, 734 F.2d

3    1396, 1400 (9th Cir. 1984).    See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In re

4    McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

5        Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood

6    Forest Associates, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property

7    interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

8    Bankruptcy Code is only the value of the lien that secures the creditor's claim.    108 S.Ct. at 630.

9    See also McCombs, Id., at 266.    Section 506(a) "limit[s] the secured status of a creditor (i.e., the

10    secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the

11    collateral."    McCombs, Id., at 266.

12        While protection of a secured creditor's interest in property is required, protection for the

13    entire bundle of rights is not required.    *In re Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365,

14    108 S.Ct. 626 (1988).    If an entity's claim exceeds the value of its interest in the property, only the

15    interest is entitled to protection; the remainder of the claim is unsecured and does not give rise to an

16    interest in property that requires protection. *See* 11 U.S.C. § 506(a); *Wright v. Union Central Life*

17    *Ins. Co.*, 311 U.S. 278, 278; 61 S.Ct. 196, 199 (1940).

18        Here, any lender asserting an interest in the Debtor's cash is adequately protected by the

19    Debtor's continuation of its business as a going concern and maintenance of the collateral that

20    secures the debts owing to the respective lenders.    The preservation of the value of a secured

21    creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor

22    seeks to use cash collateral.    In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988).    See also In re

23    Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982).    Therefore, the very use of the lenders' collateral to run

24    the Debtor's business and maintain the Debtor's assets is itself adequate protection for the

25    lenders.

26        Furthermore, in determining adequate protection, Courts have stressed the importance of

27    promoting a debtor's reorganization.    In In re O'Connor, supra, the Tenth Circuit stated:

28

In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

808 F.2d at 1937.

Based on all of the foregoing, there is no need for the Debtor to be required to make adequate protection payments, because the very act of continuing operations, paying expenses, and maintaining the Debtor's business and assets, serves to adequately protect the lenders' interests in their collateral. Nonetheless, as adequate protection, the Debtor proposes that the lenders receive replacement liens against the Debtor's post-petition assets to the extent of any diminution in the value of their collateral (which value the Debtor believes is not declining), with such replacement liens to have the same validity, priority, and extent as the pre-petition liens held by the lenders.

The Debtor cannot preserve the going-concern value of its business or maintain the lenders' collateral without the use of cash collateral. Without use of cash collateral to operate the Debtor's business, the Debtor could be forced to <u>completely</u> shut down its operations, cease maintaining its facilities, and terminate its employees; the lenders may realize losses on their secured debts; unsecured creditors may receive nothing; and the substantial going concern value of the Debtor's estate would be lost. Such a result is nonsensical and serves only to the severe detriment of the lenders and all other creditors and parties in interest. Therefore, the Court should grant this Emergency Motion and allow the Debtor to use cash collateral in accordance with the Budget and other provisions set forth above to protect the lenders and preserve the value of the Debtor's estate.

**C.    The Procedural Requirements Regarding Approval of this Motion Have Been Satisfied.**

Pursuant to Rule 4001(b)(1)(C) of the Federal Rules of Bankruptcy Procedure, the Debtor is required to serve a copy of this Motion on any entity with an alleged interest in the Debtor's cash collateral, any committee appointed or on the twenty largest unsecured creditors if no committee has been appointed, and any other entity that the Court directs.  The Debtor has complied with the foregoing by serving notice of this Motion upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the Debtor's twenty (20) largest unsecured creditors, and other parties in interest via email transmission, facsimile transmission and overnight mail (to the extent that contact information was available).  Moreover, the Debtor served a copy of this Motion and all supportive papers upon the aforementioned parties on September 1, 2010 by overnight mail.  Such parties should receive delivery by overnight mail of the notice of the Motion, the Motion and all supporting documents by not later than the morning of September 2, 2010.

### III.

### CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1.    granting this Motion on an interim basis pending a final hearing pursuant to the proposed order attached hereto as Exhibit "A";

2.    authorizing the Debtor to use cash collateral to pay all of the expenses set forth in the Budget on an interim basis pending a final hearing and authorizing the Debtor to deviate from the figures in the Budget by up to 15%, both on a line item and aggregate basis;

///

///

///

///

///

1          3.       setting a final hearing on this Motion; and

2          4.       granting such other and further relief as the Court deems just and proper.

3     Dated: September 1, 2010                     CITIZENS DEVELOPMENT CORP.

4

5                                                  By:    /s/ Krikor J. Meshefejian

6                                                         RON BENDER
                                                         KRIKOR J. MESHEFEJIAN
7                                                         LEVENE, NEALE, BENDER, YOO
                                                         & BRILL L.L.P.
8                                                         Proposed Counsel for Debtor and
                                                         Debtor in Possession
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

1  RON BENDER (SBN 143364)
   KRIKOR J. MESHEFEJIAN (SBN 255030)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email:  rb@lnbyb.com; kjm@lnbyb.com

6  Proposed Counsel for Chapter 11 Debtor and Debtor in Possession

7

8                UNITED STATES BANKRUPTCY COURT

9                 Southern District of California

10

11  In re:                          )  Case No. 10-15142-MM11
                                     )
12  CITIZENS DEVELOPMENT CORP.,      )  Chapter 11
                                     )
13        Debtor and Debtor in Possession.  )
                                     )
14                                   )  ORDER   GRANTING   DEBTOR'S
                                     )  EMERGENCY  FIRST  DAY  MOTION
15                                   )  FOR ORDER AUTHORIZING USE OF
                                     )  CASH COLLATERAL
16                                   )
                                     )
17                                   )
                                     )
18                                   )
                                     )
19                                   )
                                     )
20                                   )
                                     )
21                                   )

22

23

24

25

26

27

28

                                1

The Court, having read and considered the Emergency First Day Motion for an Order Authorizing the Use of Cash Collateral (the "Motion") filed by Citizens Development Corp., the Chapter 11 debtor and debtor in possession herein (the "Debtor"), all pleadings and papers filed in support thereof, including any evidence and declarations, for good cause shown,

**HEREBY ORDERS**, as follows:

1.    Notice of the Motion was appropriate under the circumstances and complied with the requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules, as may have been modified by the Court.

2.    The Motion is granted on an interim basis pending a final hearing, which shall be held on _____, 2010, at ___:___ ___.m. (the "Final Hearing").

3.    The Debtor is herby authorized to use cash collateral pursuant to the terms of the Motion and the Budget referenced in the Motion as Exhibit "1" through and including the conclusion of the Final Hearing.

4.    Alleged secured creditors of the Debtor with liens on the Debtor's cash collateral shall be entitled to replacement liens with the same extent, validity, scope and priority as the prepetition liens held by such creditors.

5.    Any further oppositions to the Motion must be filed with the Court, with a conformed copy delivered to chambers, and served on the United States Trustee, parties requesting special notice, the 20 largest general unsecured creditors and counsel to the Debtor so that they are received by no later than _____, 2010.

6.    Any replies to further oppositions to the Motion must be filed with the Court, with a copy delivered to chambers, and a copy served on the United States Trustee, parties requesting special notice, the 20 largest general unsecured creditors and counsel to the objecting party so that any such reply is received by the foregoing parties by no later than _____, 2010.

**IT IS SO ORDERED.**

###

2