RON BENDER (SBN 143364)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; kjm@lnbyb.com

Counsel for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## Southern District of California

| | |
|---|---|
| In re:<br><br>CITIZENS DEVELOPMENT CORP.,<br><br>      Debtor and Debtor in Possession. | Case No. 10-15142-LT11<br><br>Chapter 11<br><br>**DEBTOR'S MOTION FOR ORDER AUTHORIZING FURTHER USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MATTHEW C. DINOFIA IN SUPPORT THEREOF**<br><br>**[Ex Parte Motion For Order Shortening Notice Filed Concurrently Herewith]**<br><br>**[The Debtor is requesting a hearing date of March 1, 2011, at 2:00 p.m.]** |

Pursuant to Sections 363(c) and 361 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Citizens Development Corp., the debtor and debtor in possession in the above-entitled Chapter 11 bankruptcy case, hereby moves (the "Motion") for the entry of an order (the "Order") further authorizing the Debtor to use cash collateral in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as Exhibit "1" to the annexed Declaration of Matthew C. DiNofia (the "DiNofia Declaration").  A description of the Budget is set forth below in the annexed Memorandum of Points and Authorities.

On August 26, 2010 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On September 1, 2010, the Debtor filed an emergency motion for the entry of an order authorizing the Debtor to use cash collateral (the "First Cash Collateral Motion").  On September 9, 2010, the Court held a hearing on the First Cash Collateral Motion and granted the First Cash Collateral Motion.  On September 22, 2010, the Court entered an order (the "First Cash Collateral Order") granting the First Cash Collateral Motion.  On October 21, 2010, the Debtor filed a second motion for the entry of an order authorizing the Debtor to use cash collateral through and including February 28, 2011 (the "Second Cash Collateral Motion").  On December 6, 2010, the Court entered an order (the "Second Cash Collateral Order granting the Second Cash Collateral Motion.

On January 27, 2011, the Court ordered the substantive consolidation of the Debtor with two of the Debtor's affiliates – LSM Country Club, LLC ("Country Club") and LSM Hotel, LLC ("Hotel").  This Motion does not address any cash collateral issues related to Country Club assets or Hotel assets.  The Debtor is negotiating cash collateral issues with Symphony Asset Pool X, LLC ("Symphony") and California Credit Union ("CCU") and those issues are not the subject of this Motion.  This Motion addresses only the cash collateral previously described in the First Cash

Collateral Motion and Second Cash Collateral Motion.

Pursuant to the Second Cash Collateral Order, the Debtor's ability to use cash collateral expires on February 28, 2011.  By way of this Motion, the Debtor requests further authority, through and including August 31, 2011, to use cash collateral.  The Debtor's request for the further use of cash collateral is made upon the same terms and conditions as those previously approved by the Court.

The Debtor is the owner, either directly or through its affiliates, and operator, of the Lake San Marcos Resort and Country Club (the "Resort") located on the shores of the 80-acre Lake San Marcos, in San Diego County, approximately 30 miles north of San Diego.  The Resort is comprised of 252 acres of land that includes a 139-room hotel, 18,300 square feet of meeting and banquet space, a private 18-hole championship golf course with clubhouse and pro-shop, a public 18-hole executive golf course, three restaurants, a fitness center, tennis courts, outdoor swimming pools and the 80-acre Lake San Marcos.

The Debtor owns approximately 100 acres of land, upon which exist an 80 acre man-made lake known as Lake San Marcos, two signage parcels approximately 5,000 square feet each, and certain other land adjacent to the Lake, and park land adjacent to the Lake.  The Debtor is also the owner of Quail Restaurant which is currently not operating, and a Recreation Center which generates funds for the Debtor by way of customer payments of annual membership fees and the provision of various other services.  The Debtor also owns certain water rights which the Debtor believes are not encumbered by any liens or other claims.  The Debtor believes that the following creditors may assert an interest in the Debtor's cash collateral as that cash collateral relates to the revenues generated by the Debtor's assets other than the Country Club assets and the Hotel assets: D&A Semi Annual Mortgage Fund III, LC; Telesis Community Credit Union; and Pacific West TD Fund II, LP.  Of these creditors, Telesis Community Credit Union will likely assert an interest in the revenues generated by the Recreation Center, which is the only asset (not including the Resort Entities) of the Debtor that is currently generating income for the Debtor.  The Debtor is in the process of finalizing a cash collateral stipulation with D&A Semi Annual Mortgage Fund III.

The Debtor must be able to use the revenue it generates (primarily from the Recreation Center) in order to pay post-petition operating expenses, including, but not limited to, insurance, utilities, and maintenance expenses, all of which are necessary to maintain the Debtor's assets and the Debtor's going concern value.  Failure to pay these expenses would likely lead to a diminution in the value of the assets, as well as a loss of business which would reduce income.  All of the foregoing would cause substantial harm to the Debtor's estate and its creditors.  In short, in order for the Debtor and the Resort Entities to be able to operate the Resort while the Debtor is in Chapter 11, and to avoid immediate and irreparable harm to the Debtor's business and assets, the Debtor must be able to use its cash collateral to pay post-petition operating expenses.  The Debtor's proposed Budget, a copy of which is attached as Exhibit "1" to the annexed DiNofia Declaration, contains the expenses the Debtor believes must be paid in order for the Debtor to operate and preserve the value of its business.

The Debtor believes that to the extent that any of the above-referenced creditors do have an interest in the Debtor's cash collateral, they are adequately protected.  The Debtor also believes that the value of its assets is not declining.   As further adequate protection, the Debtor also proposes to provide the any such creditor with an actual lien on the Debtor's cash collateral with a replacement lien against the Debtor's assets, with such replacement lien to have the same extent, validity, and priority as the pre-petition lien held by such creditor.

Pursuant to Local Rules and Guidelines in respect of motions to use cash collateral, the Debtor makes the following statements regarding the relief requested by the Debtor pertaining to the Debtor's use of cash collateral and the proposed order submitted concurrently:

| **Description of Provision** | **Page No. /Line No.** |
|---|---|
| Cross-collateralization clauses | No, except to the extent that a Secured Lender is already cross-collateralized, such cross-collateralization |

| Description of Provision | Page No. /Line No. |
|---|---|
| | shall also apply to any replacement liens granted herein. |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's lien or debt. | No |
| Provisions that seek to waive rights under 11 U.S.C. § 506(c) | No |
| Provisions that grant immediately to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C.§§ 544, 545, 547, 548, and 549 | No |
| Provisions that "roll over" prepetition debt of the prepetition secured creditor to post-petition debt | No |
| Provisions which provide carveouts for administrative expenses that do not treat all professionals equally or on a pro rata basis | No |

## ADDITIONAL INFORMATION

Pursuant to Rule 4001(b)(1)(C) of the Federal Rules of Bankruptcy Procedure, the Debtor is required to serve a copy of this Motion on any entity with an alleged interest in the Debtor's cash collateral, any committee appointed or on the twenty largest unsecured creditors if no committee has been appointed, and any other entity that the Court directs. The Debtor has complied with the foregoing by serving notice of this Motion upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the Debtor's twenty (20) largest unsecured creditors, and other parties in interest via regular mail. This Motion is being made on shortened notice and the Debtor has concurrently submitted an ex parte motion for an order shortening the notice period for a hearing on this Motion. The Debtor requests a hearing date of March 1, 2011, at 2:00 p.m., as there is another proceeding in that case scheduled to be heard on that date and at that time.

1  The relief sought in this Motion is based upon this Motion, the annexed Memorandum and

2  DiNofia Declaration in support of this Motion, the statements, arguments and representations of

3  counsel to be made at the hearing on this Motion, and any other evidence properly presented to

4  the Court at or prior to the hearing on this Motion.

5  **WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

6  1.  granting this Motion in its entirety;

7  2.  authorizing the Debtor to use cash collateral to pay all of the expenses set forth in

8  the Budget and authorizing the Debtor to deviate from the figures in the Budget by up to 15%,

9  both on a line item and aggregate basis; and

10  3.  granting such other and further relief as the Court deems just and proper.

11

12  Dated: February 15, 2011          CITIZENS DEVELOPMENT CORP.

13

14  By: */s/ Krikor J. Meshefejian*
             RON BENDER

15          KRIKOR J. MESHEFEJIAN
             LEVENE, NEALE, BENDER, YOO

16          & BRILL L.L.P.
             Counsel for Debtor and Debtor in

17          Possession

18

19

20

21

22

23

24

25

26

27

28

Cash Collateral Motion (Third)          5

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   STATEMENT OF FACTS

**A.    Bankruptcy Filing.**

1.     On August 26, 2010 (the "Petition Date"), Citizens Development Corp. a California corporation, the debtor and debtor in possession herein (the "Debtor"), filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code").   The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.    The Debtor's Ownership Structure and Operations.**

2.     The Debtor is the owner (either directly or through its affiliates), and operator, of Lake San Marcos Country Club & Resort (the "Resort").   The Resort is located on the shores of the 80-acre Lake San Marcos, in San Diego County, approximately 30 miles north of San Diego. The Resort is comprised of 252 acres of land that includes a 139-room hotel (the "Hotel Property"), 18,300 square feet of meeting and banquet space, a private 18-hole championship golf course with clubhouse and pro-shop (the "Country Club Property"), a public 18-hole executive golf course, three restaurants, a fitness center, four tennis courts, two outdoor swimming pools and the 80-acre Lake San Marcos.

3.     On January 27, 2011, the Court ordered the substantive consolidation of the Debtor with two of its affiliates – LSM Country Club, LLC ("Country Club") and LSM Hotel, LLC ("Hotel").   Pursuant to substantive consolidation, Country Club and Hotel are deemed to have merged into CDC and no longer exist as legal entities.   The assets and liabilities of Country Club and Hotel now belong to the Debtor's estate, but this Motion seeks only to address the Debtor's cash collateral other than in connection with the assets of Country Club and Hotel.   The Debtor is working with Symphony Asset Pool X ("Symphony") which is the secured lender on the Hotel Property and California Credit Union ("CCU") which is the secured lender on the Country Club Property, in formulating cash collateral stipulation but no such agreements have been finalized or filed with the Court at this time.

**C.    The Debtor's Assets and Debt Structure.**

4.    Aside from the assets of Hotel and Country Club, the Debtor's estate's assets comprise of approximately 100 acres of land, upon which exist an 80 acre man-made lake known as Lake San Marcos (the "Lake"), two signage parcels (the "Signage Parcels") which are approximately 5,000 square feet each, certain other land adjacent to the Lake (the "Lakefront Land"), and park land adjacent to the Lake ("Park Land").  The Debtor is also the owner of Quail Restaurant (the "Restaurant") and a recreation center (the "Recreation Center").  The Debtor also owns certain water rights (the "Water Rights"), as described below.

*a.    The Restaurant Property.*

5.    The Debtor's Restaurant property is located at 1035 La Bonita Drive, Lake San Marcos, California.  The Restaurant, currently not operating, is a 150-seat full service lakefront restaurant with dramatic 20-foot floor-to-ceiling windows showcasing the Lake.  Due to lack of business, the Restaurant ceased operations in January, 2009.  The Debtor has attempted to find a tenant to lease the Restaurant space and pay rent to the Debtor, but has had difficulty attracting a tenant willing to occupy and pay rent for the Restaurant property, despite listing the Restaurant property with multiple commercial brokers in the area who specialize in the leasing of restaurant space.  The Debtor continues to search for a tenant to occupy the Restaurant.  At times, Country Club utilizes the Restaurant to host events, and Hotel guests utilize the Restaurant for events and ceremonies.  Overall, the revenue generated by the Restaurant, is not adequate to pay for the monthly debt service, tax, insurance and other expenses incurred by the Restaurant.

6.    The Restaurant is encumbered by a deed of trust in favor of D&A Semi Annual Mortgage Fund III, LC ("D&A"), securing a claim in the approximate amount of $1,550,000 million, pursuant to a loan which the Debtor obtained from D&A (the "D&A Loan").  The First D&A Loan matured in March, 2009, and the Debtor has been unable to repay the D&A Loan either directly or through a refinancing.  D&A asserts a security interest in any cash generated by the Restaurant, and the Debtor is in the process of entering into a stipulation with D&A pursuant to which the Debtor will commence making adequate protection payments to D&A.

**b.    _The Recreation Center Property._**

7.    The Recreation Center includes a 3,388 square foot conference center with 15-foot ceilings that can accommodate up to 400 guests.  The Recreation Center also provides amenities for surrounding homeowners and hotel guests, including swimming pools, tennis, boat rentals, and fishing.   The Debtor generates income primarily from the following: (1) payments of assessments by homeowners and homeowners associations which enter into leases with the Debtor for the use of the Lake and Recreation Center facilities (there are currently between 800-900 such leases); and (2) payments of fees from groups and other parties that lease conference space for conferences and various other types of events.  Assessments are the primary source of revenue for the Recreation Center.  Assessments are collected twice per year, and, as a result of the interrelatedness of the Resort Entities, are typically utilized to pay expenses of the Resort Entities as such assessments are collected, therefore leaving the Recreation Center with budget shortfalls during the course of the year.  Lake San Marcos Community Association ("LSMCA") which does not have any agreement with the Debtor but which purports to represent various undisclosed home owners' associations which purportedly do have agreements with the Debtor, has filed a motion seeking adequate protection of its interests and the fees paid to the Debtor.  The Debtor has responded to that motion which is set for hearing on March 1, 2011, and the Debtor's proposed Budget attached as Exhibit "1" to the annexed Declaration of Matthew C. DiNofia includes monetary allocations for repair and maintenance and capital reserves for the Recreation Center.

8.    The Recreation Center is encumbered by a first deed of trust in favor of Telesis Community Credit Union ("Telesis"), securing a claim in the approximate amount of $4,800,000 pursuant to a loan which the Debtor obtained from Telesis in the original principal sum of $4,740,000 (the "Telesis Loan").  The Telesis Loan matured in August, 2009, and the Debtor has been unable to repay the Telesis Loan either directly or through a refinancing.  In April, 2010, Telesis filed a lawsuit against the Debtor seeking to collect on the alleged debts owed by the Debtor (the "Telesis Litigation").  The Telesis Litigation was filed in the Superior Court for the

State of California, County of San Diego, Case No. 37-2010-00090427-CU-BC-CDL.  Telesis and the Debtor have subsequently entered into a forbearance agreement which has essentially stayed the Telesis Litigation, but there currently is no permanent or long-term resolution with respect to the Telesis Loan, and there is no assurance that the Telesis Litigation will remain stayed.  The Debtor believes that Telesis may assert a security interest in any cash generated by the Recreation Center, but to date, Telesis has not participated in or opposed any of the Debtor's requests to use cash collateral.

           **c.**      ***The Lake and Lakefront Land.***

9.      The Lake and Lakefront Land comprise of approximately 110 acres, with the Lakefront Land comprising approximately 30 acres of that total amount.  The Lakefront Land is currently undeveloped.  The Lake offers various recreational activities such as boating, where resort guests can rent boats.  Such rentals generate income for the Debtor and such income is reflected in the Budget for the Recreation Center, which Budget is included in Exhibit 1 to the DiNofia Declaration.  The Lake and Lakefront Land are encumbered by a first deed of trust in favor of Pacific West TD Fund II, LP ("Pac West"), securing a claim in the approximate amount of $2,800,000 pursuant to a loan which the Debtor obtained from Pac West in the original principal sum of $2,800,000 (the "Pac West Loan").  The Pac West Loan matured in August, 2009, and is cross-collateralized against other assets owned by various entities owned or controlled by Mr. DiNofia.  The Debtor believes that Pac West may assert a security interest in any cash generated by the Lake and Lakefront Land, but to date, Pac West has not participated in or opposed any of the Debtor's requests to use cash collateral.

           **d.**      ***The Signage Parcels.***

10.      The Signage Parcels consist of two approximate 5,000 square feet each pieces of real property located on the corner of Rancho Santa Fe Road and Lake San Marcos Road.  The Signage Parcels provide major-thoroughfare exposure and signage for the Resort.  The Signage Parcels are encumbered by a first deed of trust in favor of Chris DiNofia ("Chris"), securing a claim in the approximate amount of $250,000 pursuant to a loan agreement which authorizes the

Debtor to borrow up to $2,000,000 from Chris.  Chris DiNofia and Matthew DiNofia are brothers.  This loan matures in August, 2012.

       *e.*      ***Park Land***.

      11.      The Debtor owns approximately 8,000 square feet of Park Land adjacent to the Lake which is unencumbered land.

       *f.*      ***Water Rights***.

      12.      The Debtor has been the long-time owner of various water rights which permit the Debtor to pump water from the Lake.  This is a significant asset given that the water is utilized to service the golf courses owned by the Debtor's affiliates.

**D.**      **Summary of the Circumstances that Led to the Filing of the Debtor's Chapter 11 Case.**

      13.      The hospitality and leisure activity industries have experienced a major decline in revenues during the current, ongoing, economic recession.  For the Debtor and its affiliates, such a decline began in August-September, 2008.  Since that time, the revenues generated by the Debtor and its affiliates have decreased by more than fifty percent (50%).  The Debtor has been forced to shut down its Restaurant operations, and has been unable to find a tenant to replace the Debtor's operations at the Restaurant.  During that time, while the Debtor's revenues continued to decrease, most of the Debtor's secured debt obligations came due, but the Debtor has not been able to obtain alternative financing.  Coupled with these financial problems, the Debtor and its affiliates face significant competition from multiple new golf courses and hotels in an extremely competitive industry.  As financial pressure has mounted against the Debtor and its affiliates, the Debtor filed for Chapter 11 protection to preserve estate assets and attempt to collectively restructure their debt obligations and reorganize so as to be able to effectively compete in the marketplace.

**E.**      **The Debtor's Post-petition Operations And Use Of Cash Collateral.**

      14.      On September 1, 2010, the Debtor filed an emergency motion for the entry of an order authorizing the Debtor to use cash collateral (the "First Cash Collateral Motion").  On September 9, 2010, the Court held a hearing on the First Cash Collateral Motion and granted the

First Cash Collateral Motion.  On September 22, 2010, the Court entered an order (the "First Cash Collateral Order") granting the First Cash Collateral Motion.

15.    On October 21, 2010, the Debtor filed a second motion for the entry of an order authorizing the Debtor to use cash collateral through and including February 28, 2011 (the "Second Cash Collateral Motion").  On December 6, 2010, the Court entered an order (the "Second Cash Collateral Order granting the Second Cash Collateral Motion.

16.    On January 27, 2011, the Court ordered the substantive consolidation of the Debtor with two of the Debtor's affiliates – LSM Country Club, LLC ("Country Club") and LSM Hotel, LLC ("Hotel").  This Motion does not address any cash collateral issues related to Country Club assets or Hotel assets.  The Debtor is negotiating cash collateral issues with Symphony Asset Pool X ("Symphony") and California Credit Union ("CCU") and those issues are not the subject of this Motion.  This Motion addresses only the cash collateral previously described in the First Cash Collateral Motion and Second Cash Collateral Motion.

17.    Pursuant to the Second Cash Collateral Order, the Debtor's ability to use cash collateral expires on February 28, 2011.  By way of this Motion, the Debtor requests further authority, through and including August 31, 2011, to use cash collateral.  The Debtor's request for the further use of cash collateral is made upon the same terms and conditions as those previously approved by the Court, bearing in mind that the Debtor is in the process of finalizing a cash collateral stipulation with D&A.

F.    **The Debtor's Further Need for Use of Cash Collateral and Proposed Operating Budget.**

18.    The Debtor has authorization to use cash collateral through and including February 28, 2011.  The Debtor must be able to continue to use the revenue generated from its operations in order to pay post-petition operating expenses, including, but not limited to, insurance, employees, utilities, and maintenance expenses, all of which are necessary to maintain the Debtor's operations and the Debtor's going concern value.  Failure to pay these expenses would likely lead to a loss of business, which would reduce income and cause substantial harm to the Debtor's estate and its

creditors.  In short, in order for the Debtor to be able to operate its business (including managing and running its affiliates' businesses) while in Chapter 11 and to avoid immediate and irreparable harm to its business and operations, the Debtor must be able to use its cash collateral to pay post-petition operating expenses.  While the revenues generated by the Debtor's directly owned assets such as the Restaurant and Recreation Center may not be sufficient to cover all of the Debtor's expenses, such revenues are still needed to address, to the extent possible, the Debtor's expenses.

19.    The Debtor's proposed Budget, a copy of which is attached as Exhibit "1" to the annexed Declaration of Matthew C. DiNofia, contains the expenses the Debtor believes must be paid in order for the Debtor to operate and preserve the value of its business.  The Budget discloses revenues and expenses on a monthly basis through and including August 2011.  The revenues disclosed by the Recreation Center, particularly revenues from association dues, are allocated on a monthly basis, even though the Debtor generally receives most of such revenues only twice per year.  As a result of expending most if not all of such revenues already, the Debtor may experience significant budget shortfalls which, with the assistance of other Resort revenues (those unrelated to Hotel and Executive Course), the Debtor can address.  Additionally, the Debtor expects to collect more fees during March 2011 through August 2011, as compared to December 2010 – February 2011.  This accounts for the increase in revenue as compared to the Debtor's prior cash collateral budget.  The expenses contained in the Budget are necessary to enable the Debtor to avoid immediate and irreparable harm to the Debtor's bankruptcy estate, because by not paying these expenses, the Debtor runs to risk of, among others, losing the ability to further obtain such services, and the risk of deterioration of its assets if the Debtor cannot maintain its assets.

## II.

## DISCUSSION

**A.    The Debtor Must Be Authorized To Use Cash Collateral to Operate, Maintain and Preserve Its Business and the Property in Accordance with the Budget.**

The Debtor's use of property of its estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section . . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) allows the use of "cash collateral" under subsection (c)(l) if:

> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (B.A.P. 9th Cir. 1991).  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  In re Dynaco Corporation, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

The only sources of revenue available to the Debtor to use to operate, maintain and preserve its business are the Debtor's cash existing on the Petition Date and post-petition revenues from the operation of the Resort.  As a result, the Debtor has no ability to continue to

1    operate its business and maintain and preserve the going concern value of its business unless the

2    Debtor has immediate access to, and use of, its cash, including, but not limited to, insurance, real

3    estate taxes, salaries and wages, utilities, and maintenance expenses.

4      The expenses the Debtor must be able to pay during this Chapter 11 bankruptcy case are

5    set forth in the Budget documents attached to the DiNofia Declaration.  While the Debtor may not

6    generate enough revenue to cover all such expenses, the Debtor has formulated a "lean" budget

7    and the Debtor does generate some revenue which the Debtor is expecting will increase during the

8    coming spring and summer months.  The Debtor will need Court authorization to pay the

9    expenses it is capable of paying using the cash collateral of its lenders (which the Debtor believes

10   will most likely be limited to Telesis since the Debtor and D&A are in the process of entering into

11   a cash collateral stipulation the only source of revenue for the Debtor other than from the Country

12   Club Property and the Hotel Property is the Recreation Center).  The Debtor's inability to pay

13   those expenses would cause immediate and irreparable harm to the Debtor, its operations, and this

14   bankruptcy estate.  Indeed, the Debtor's inability to pay basic and critical operating expenses such

15   as payroll, utilities, and insurance would prevent the Debtor from operating its business and the

16   Resort and would likely result in the loss of income.  Failure to continue operations and provide

17   the services Resort guests and customers are accustomed to receiving and expect to receive may

18   also subject the Debtor's business to harm.  All of the foregoing would cause substantial harm to

19   the Debtor's estate and its creditors.

20   **B.**    **Any Creditors with an Interest in the Debtor's Cash Collateral are Adequately**

21     **Protected by the Debtor's Continued Use Of Cash Collateral.**

22     To the extent that an entity has a valid security interest in the revenues generated by

23   property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

24   Code.  Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

25   creditor's cash collateral if the secured creditor is adequately protected.  In re Mellor, 734 F.2d

26   1396, 1400 (9th Cir. 1984).  See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In re

27   McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

28

Pursuant to the Supreme Court case of <u>United Savings Association v. Timbers of Inwood Forest Associates</u>, 108 S.Ct. 626, 629 (1988) ("<u>Timbers</u>") and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.  <u>See</u> <u>also</u> <u>McCombs</u>, <u>Id.,</u> at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral."  <u>McCombs</u>, <u>Id.,</u> at 266.

While protection of a secured creditor's interest in property is required, protection for the entire bundle of rights is not required.  *In re Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 108 S.Ct. 626 (1988).  If an entity's claim exceeds the value of its interest in the property, only the interest is entitled to protection; the remainder of the claim is unsecured and does not give rise to an interest in property that requires protection. *See* 11 U.S.C. § 506(a); *Wright v. Union Central Life Ins. Co.*, 311 U.S. 278, 278; 61 S.Ct. 196, 199 (1940).

Here, any lender asserting an interest in the Debtor's cash is adequately protected by the Debtor's continuation of its business as a going concern and maintenance of the collateral that secures the debts owing to the respective lenders.  The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral.  <u>In re Triplett</u>, 87 B.R. 25 (Bankr. W.D.Tex. 1988).  <u>See also</u> <u>In re Stein</u>, 19 B.R. 458 (Bankr. E.D.Pa. 1982).  Therefore, the very use of the lenders' collateral to run the Debtor's business and maintain the Debtor's assets is itself adequate protection for the lenders.

Furthermore, in determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization.  In <u>In re O'Connor</u>, <u>supra</u>, the Tenth Circuit stated:

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest.  Because the ultimate benefit to be achieved by a successful reorganization inures

to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

808 F.2d at 1937.

Based on all of the foregoing, there is no need for the Debtor to be required to make adequate protection payments, because the very act of continuing operations, paying expenses, and maintaining the Debtor's business and assets, serves to adequately protect the lenders' interests in their collateral.  Nonetheless, as adequate protection, the Debtor proposes that the lenders receive replacement liens against the Debtor's post-petition assets to the extent of any diminution in the value of their collateral (which value the Debtor believes is not declining), with such replacement liens to have the same validity, priority, and extent as the pre-petition liens held by the lenders.

The Debtor cannot preserve the going-concern value of its business or maintain the lenders' collateral without the use of cash collateral.  Without use of cash collateral to operate the Debtor's business, the Debtor could be forced to <u>completely</u> shut down its operations, cease maintaining its facilities and assets, and terminate its employees; the lenders may realize losses on their secured debts; unsecured creditors may receive nothing; and the substantial going concern value of the Debtor's estate would be lost.  Such a result is nonsensical and serves only to the severe detriment of the lenders and all other creditors and parties in interest.  Therefore, the Court should grant this Motion and allow the Debtor to use cash collateral in accordance with the Budget and other provisions set forth above to protect the lenders and any other party asserting an interest in the Debtor's cash collateral, such as any HOA's, and preserve the value of the Debtor's estate.

## C.  **The Procedural Requirements Regarding Approval of this Motion Have Been Satisfied.**

Pursuant to Rule 4001(b)(1)(C) of the Federal Rules of Bankruptcy Procedure, the Debtor is required to serve a copy of this Motion on any entity with an alleged interest in the Debtor's

cash collateral, any committee appointed or on the twenty largest unsecured creditors if no committee has been appointed, and any other entity that the Court directs.  The Debtor has complied with the foregoing by serving notice of this Motion upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the Debtor's twenty (20) largest unsecured creditors, and other parties in interest via regular mail.  This Motion is being made on shortened notice and the Debtor has concurrently submitted an ex parte motion for an order shortening the notice period for a hearing on this Motion.  The Debtor requests a hearing date of March 1, 2011, at 2:00 p.m., as there is another proceeding in that case scheduled to be heard on that date and at that time.

## III.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1.     granting this Motion in its entirety;

2.     authorizing the Debtor to use cash collateral to pay all of the expenses set forth in the Budget and authorizing the Debtor to deviate from the figures in the Budget by up to 15%, both on a line item and aggregate basis; and

3.     granting such other and further relief as the Court deems just and proper.

Dated: February 15, 2011                          CITIZENS DEVELOPMENT CORP.

By:   _/s/ Krikor J. Meshefejian_
                                              RON BENDER
                                              KRIKOR J. MESHEFEJIAN
                                              LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
                                              Counsel for Debtor and Debtor in Possession

## DECLARATION OF MATTHEW C. DINOFIA

I, Matthew C. DiNofia, hereby declare as follows:

1.       I am over 18 years of age.  I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.       I am the President and owner of Citizens Development Corp., the Chapter 11 debtor and debtor in possession in the above-referenced bankruptcy case (the "Debtor").

3.       I have access to the books and records of the Debtor and entities related to the Debtor.  I am familiar with the history, organization, operations and financial condition of the Debtor.  The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor and its affiliates to accurately and completely take, make, and maintain such records and documents.  I am a custodian of records for the Debtor, and have direct knowledge of how the Debtor maintains its books and records.

4.       I make this declaration in support of the Cash Collateral Motion filed by the Debtor. Unless otherwise stated all capitalized terms herein have the same meanings as in the Cash Collateral Motion.

**A.       Bankruptcy Filing.**

5.       On August 26, 2010 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code").  The Debtor is managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.       The Debtor's Ownership Structure and Operations.**

6.       The Debtor is the owner (either directly or through its affiliates), and operator, of Lake San Marcos Country Club & Resort (the "Resort").  The Resort is located on the shores of the 80-acre Lake San Marcos, in San Diego County, approximately 30 miles north of San Diego. The Resort is comprised of 252 acres of land that includes a 139-room hotel (the "Hotel

Property"), 18,300 square feet of meeting and banquet space, a private 18-hole championship golf course with clubhouse and pro-shop (the "Country Club Property"), a public 18-hole executive golf course, three restaurants, a fitness center, four tennis courts, two outdoor swimming pools and the 80-acre Lake San Marcos.

7.      On January 27, 2011, the Court ordered the substantive consolidation of the Debtor with two of its affiliates – LSM Country Club, LLC ("Country Club") and LSM Hotel, LLC ("Hotel").   Pursuant to substantive consolidation, Country Club and Hotel are deemed to have merged into CDC and no longer exist as legal entities.   I understand that the assets and liabilities of Country Club and Hotel now belong to the Debtor's estate, but <u>this Motion seeks only to address the Debtor's cash collateral other than in connection with the assets of Country Club and Hotel</u>.   The Debtor is working with Symphony Asset Pool X ("Symphony") which is the secured lender on the Hotel Property and California Credit Union ("CCU") which is the secured lender on the Country Club Property, in formulating cash collateral stipulations but no such agreements have been finalized or filed with the Court at this time.

**C.      The Debtor's Assets and Debt Structure.**

8.      Aside from the assets of Hotel and Country Club, the Debtor's estate's assets comprise of approximately 100 acres of land, upon which exist an 80 acre man-made lake known as Lake San Marcos (the "Lake"), two signage parcels (the "Signage Parcels") which are approximately 5,000 square feet each, certain other land adjacent to the Lake (the "Lakefront Land"), and park land adjacent to the Lake ("Park Land").   The Debtor is also the owner of Quail Restaurant (the "Restaurant") and a recreation center (the "Recreation Center").   The Debtor also owns certain water rights (the "Water Rights"), as described below.

*a.      **The Restaurant Property.***

9.      The Debtor's Restaurant property is located at 1035 La Bonita Drive, Lake San Marcos, California.   The Restaurant, currently not operating, is a 150-seat full service lakefront restaurant with dramatic 20-foot floor-to-ceiling windows showcasing the Lake.   Due to lack of business, the Restaurant ceased operations in January, 2009.   The Debtor has attempted to find a

tenant to lease the Restaurant space and pay rent to the Debtor, but has had difficulty attracting a tenant willing to occupy and pay rent for the Restaurant property, despite listing the Restaurant property with multiple commercial brokers in the area who specialize in the leasing of restaurant space.  The Debtor continues to search for a tenant to occupy the Restaurant.  At times, Country Club utilizes the Restaurant to host events, and Hotel guests utilize the Restaurant for events and ceremonies.  Overall, the revenue generated by the Restaurant, is not adequate to pay for the monthly debt service, tax, insurance and other expenses incurred by the Restaurant.

10.     The Restaurant is encumbered by a deed of trust in favor of D&A Semi Annual Mortgage Fund III, LC ("D&A"), securing a claim in the approximate amount of $1,550,000 million, pursuant to a loan which the Debtor obtained from D&A (the "D&A Loan").  The First D&A Loan matured in March, 2009, and the Debtor has been unable to repay the D&A Loan either directly or through a refinancing.  D&A asserts a security interest in any cash generated by the Restaurant, and the Debtor is in the process of entering into a stipulation with D&A pursuant to which the Debtor will commence making adequate protection payments to D&A.

**c.     _The Recreation Center Property._**

11.     The Recreation Center includes a 3,388 square foot conference center with 15-foot ceilings that can accommodate up to 400 guests.  The Recreation Center also provides amenities for surrounding homeowners and hotel guests, including swimming pools, tennis, boat rentals, and fishing.  The Debtor generates income primarily from the following: (1) payments of assessments by homeowners and homeowners associations which enter into leases with the Debtor for the use of the Lake and Recreation Center facilities (there are currently between 800-900 such leases); and (2) payments of fees from groups and other parties that lease conference space for conferences and various other types of events.  Assessments are the primary source of revenue for the Recreation Center.  Assessments are collected twice per year, and, as a result of the interrelatedness of the Resort Entities, are typically utilized to pay expenses of the Resort Entities as such assessments are collected, therefore leaving the Recreation Center with budget shortfalls during the course of the year.  Lake San Marcos Community Association ("LSMCA")

1  which does not have any agreement with the Debtor but which purports to represent various

2  undisclosed home owners' associations which purportedly do have agreements with the Debtor,

3  has filed a motion seeking adequate protection of its interests and the fees paid to the Debtor.  The

4  Debtor has responded to that motion which is set for hearing on March 1, 2011, and the Debtor's

5  proposed Budget attached as Exhibit "1" to this Declaration includes monetary allocations for

6  repair and maintenance and capital reserves for the Recreation Center.

7           12.    The Recreation Center is encumbered by a first deed of trust in favor of Telesis

8  Community Credit Union ("Telesis"), securing a claim in the approximate amount of $4,800,000

9  pursuant to a loan which the Debtor obtained from Telesis in the original principal sum of

10  $4,740,000 (the "Telesis Loan").  The Telesis Loan matured in August, 2009, and the Debtor has

11  been unable to repay the Telesis Loan either directly or through a refinancing.  In April, 2010,

12  Telesis filed a lawsuit against the Debtor seeking to collect on the alleged debts owed by the

13  Debtor (the "Telesis Litigation").  The Telesis Litigation was filed in the Superior Court for the

14  State of California, County of San Diego, Case No. 37-2010-00090427-CU-BC-CDL.  Telesis

15  and the Debtor have subsequently entered into a forbearance agreement which has essentially

16  stayed the Telesis Litigation, but there currently is no permanent or long-term resolution with

17  respect to the Telesis Loan, and there is no assurance that the Telesis Litigation will remain

18  stayed.  The Debtor believes that Telesis may assert a security interest in any cash generated by

19  the Recreation Center, but to date, Telesis has not participated in or opposed any of the Debtor's

20  requests to use cash collateral.

21           c.    ___The Lake and Lakefront Land___.

22           13.    The Lake and Lakefront Land comprise of approximately 110 acres, with the

23  Lakefront Land comprising approximately 30 acres of that total amount.  The Lakefront Land is

24  currently undeveloped.  The Lake offers various recreational activities such as boating, where

25  resort guests can rent boats.[1]  Such rentals generate income for the Debtor and such income is

26

27  [1]    The Debtor is, and has been for more than a year, involved in various disputes with

28        governmental and environmental agencies regarding the Lake and its environmental impact.

reflected in the Budget for the Recreation Center, which Budget is included in Exhibit "1" to this Declaration.  The Lake and Lakefront Land are encumbered by a first deed of trust in favor of Pacific West TD Fund II, LP ("Pac West"), securing a claim in the approximate amount of $2,800,000 pursuant to a loan which the Debtor obtained from Pac West in the original principal sum of $2,800,000 (the "Pac West Loan").  The Pac West Loan matured in August, 2009, and is cross-collateralized against other assets owned by various entities owned or controlled by Mr. DiNofia.  The Debtor believes that Pac West may assert a security interest in any cash generated by the Lake and Lakefront Land, but to date, Pac West has not participated in or opposed any of the Debtor's requests to use cash collateral.

       *e.*    ***The Signage Parcels.***

      14.    The Signage Parcels consist of two approximate 5,000 square feet each pieces of real property located on the corner of Rancho Santa Fe Road and Lake San Marcos Road.  The Signage Parcels provide major-thoroughfare exposure and signage for the Resort.  The Signage Parcels are encumbered by a first deed of trust in favor of Chris DiNofia ("Chris"), securing a claim in the approximate amount of $250,000 pursuant to a loan agreement which authorizes the Debtor to borrow up to $2,000,000 from Chris.  Chris DiNofia and Matthew DiNofia are brothers. This loan matures in August, 2012.

       *e.*    ***Park Land***.

      15.    The Debtor owns approximately 8,000 square feet of Park Land adjacent to the Lake which is unencumbered land.

       *f.*    ***Water Rights***.

      16.    The Debtor has been the long-time owner of various water rights which permit the Debtor to pump water from the Lake.  This is a significant asset given that the water is utilized to service the golf courses owned by the Debtor's affiliates.

**D.**    **Summary of the Circumstances that Led to the Filing of the Debtor's Chapter 11 Case.**

These issues have negatively affected the Debtor's business operations.

17.     The hospitality and leisure activity industries have experienced a major decline in revenues during the current, ongoing, economic recession.  For the Debtor and its affiliates, such a decline began in August-September, 2008.  Since that time, the revenues generated by the Debtor and its affiliates have decreased by more than fifty percent (50%).  The Debtor has been forced to shut down its Restaurant operations, and has been unable to find a tenant to replace the Debtor's operations at the Restaurant.  During that time, while the Debtor's revenues continued to decrease, most of the Debtor's secured debt obligations came due, but the Debtor has not been able to obtain alternative financing.  Coupled with these financial problems, the Debtor and its affiliates face significant competition from multiple new golf courses and hotels in an extremely competitive industry.  As financial pressure has mounted against the Debtor and its affiliates, the Debtor filed for Chapter 11 protection to preserve estate assets and attempt to collectively restructure their debt obligations and reorganize so as to be able to effectively compete in the marketplace.

**E.      The Debtor's Post-petition Operations And Use Of Cash Collateral.**

18.     On September 1, 2010, the Debtor filed an emergency motion for the entry of an order authorizing the Debtor to use cash collateral (the "First Cash Collateral Motion").  On September 9, 2010, the Court held a hearing on the First Cash Collateral Motion and granted the First Cash Collateral Motion.  On September 22, 2010, the Court entered an order (the "First Cash Collateral Order") granting the First Cash Collateral Motion.

19.     On October 21, 2010, the Debtor filed a second motion for the entry of an order authorizing the Debtor to use cash collateral through and including February 28, 2011 (the "Second Cash Collateral Motion").  On December 6, 2010, the Court entered an order (the "Second Cash Collateral Order granting the Second Cash Collateral Motion.

20.     On January 27, 2011, the Court ordered the substantive consolidation of the Debtor with two of the Debtor's affiliates – LSM Country Club, LLC ("Country Club") and LSM Hotel, LLC ("Hotel").  This Motion does not address any cash collateral issues related to Country Club assets or Hotel assets.  The Debtor is negotiating cash collateral issues with Symphony Asset Pool X ("Symphony") and California Credit Union ("CCU") and those issues are not the subject of this

1   Motion.  This Motion addresses only the cash collateral previously described in the First Cash

2   Collateral Motion and Second Cash Collateral Motion.

3          21.     Pursuant to the Second Cash Collateral Order, the Debtor's ability to use cash

4   collateral expires on February 28, 2011.  By way of this Motion, the Debtor requests further

5   authority, through and including August 31, 2011, to use cash collateral.  The Debtor's request for

6   the further use of cash collateral is made upon the same terms and conditions as those previously

7   approved by the Court, bearing in mind that the Debtor is in the process of finalizing a cash

8   collateral stipulation with D&A.

9   **F.     The Debtor's Further Need for Use of Cash Collateral and Proposed Operating**

10        **Budget.**

11         22.     The Debtor has authorization to use cash collateral through and including February

12  28, 2011.  The Debtor must be able to continue to use the revenue generated from its operations in

13  order to pay post-petition operating expenses, including, but not limited to, insurance, employees,

14  utilities, and maintenance expenses, all of which are necessary to maintain the Debtor's operations

15  and the Debtor's going concern value.  Failure to pay these expenses would likely lead to a loss of

16  business, which would reduce income and cause substantial harm to the Debtor's estate and its

17  creditors.  In short, in order for the Debtor to be able to operate its business (including managing

18  and running its affiliates' businesses) while in Chapter 11 and to avoid immediate and irreparable

19  harm to its business and operations, the Debtor must be able to use its cash collateral to pay post-

20  petition operating expenses.  While the revenues generated by the Debtor's directly owned assets

21  such as the Restaurant and Recreation Center may not be sufficient to cover all of the Debtor's

22  expenses, such revenues are still needed to address, to the extent possible, the Debtor's expenses.

23         23.     The Debtor's proposed Budget, a copy of which is attached here as Exhibit "1"

24  which has been primarily prepared by Robert Hilber (the Chief Operating Officer of the Debtor) and

25  which I have reviewed and approved, contains the expenses the Debtor believes must be paid in

26  order for the Debtor to operate and preserve the value of its business.  The Budget discloses

27  revenues and expenses on a monthly basis through August 31, 2011.  The revenues disclosed by the

28

1   Recreation Center, particularly revenues from association dues, are allocated on a monthly basis,
2   even though the Debtor generally receives most of such revenues only twice per year.  As a result of
3   expending most if not all of such revenues already, the Debtor may experience significant budget
4   shortfalls which, with the assistance of other Resort revenues (those unrelated to Hotel and
5   Executive Course), the Debtor can address.  Additionally, the Debtor expects to collect more fees
6   during March 2011 through August 2011, as compared to December 2010 – February 2011.  This
7   accounts for the increase in revenue as compared to the Debtor's prior cash collateral budget.  The
8   expenses contained in the Budget are necessary to enable the Debtor to avoid immediate and
9   irreparable harm to the Debtor's bankruptcy estate, because by not paying these expenses, the
10  Debtor runs to risk of, among others, losing the ability to further obtain such services, and the risk
11  of deterioration of its assets if the Debtor cannot maintain its assets.

12          I declare under penalty of perjury that the foregoing is true and correct to the best of my
13  knowledge.  Executed this 15th day of February, 2011, at San Diego, California.

15                                                      MATTHEW C. DINOFIA

**EXHIBIT "1"**



**Lake San Marcos**
RESORT & COUNTRY CLUB

**6 MONTH OPERATING BUDGET**

**Citizens Development Corp.**
February - July, 2011

| | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 |
|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | |
| Assessments | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 |
| Boat Rental | 200.00 | 400.00 | 450.00 | 800.00 | 1,800.00 | 1,000.00 |
| Dock Rental | 8,500.00 | 8,500.00 | 8,500.00 | 8,500.00 | 8,500.00 | 8,500.00 |
| Escrow Transfer Fees | - | 250.00 | | 250.00 | - | |
| Event Revenue | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| Fitness Center | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 |
| Interest Earned | - | | - | | - | - |
| LSM Exec Course Revenue | 5,400.00 | 5,400.00 | 5,400.00 | 5,400.00 | 5,400.00 | 5,400.00 |
| Newsletter Advertising | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 |
| Other Revenue | | | - | | | |
| Ramp/Dry Dock Fees | | 150.00 | - | | 150.00 | |
| Tennis Commission | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| **TOTAL REVENUE** | 69,535.00 | 70,135.00 | 69,785.00 | 70,385.00 | 71,285.00 | 70,335.00 |
| | | | | | | |
| **EXPENSES** | | | | | | |
| **Payroll Expenses** | | | | | | |
| Wages - Boat Maintenance | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 |
| Wages - Boat Rental | 60.00 | 100.00 | 250.00 | 500.00 | 600.00 | 550.00 |
| Wages - CDC | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 |
| Wages - Dock Repair | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Wages - Lake | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 |
| Wages - Lodge | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 |
| Wages - Maintenance | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 | 1,800.00 |
| Wages - Office | 2,400.00 | 2,400.00 | 2,400.00 | 2,400.00 | 2,400.00 | 2,400.00 |
| Wages - Pool Repair & Maintenance | 175.00 | 175.00 | 175.00 | 175.00 | 175.00 | 175.00 |
| Wages - The Quail Restaurant | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| Wages - Vac/Hol/Sick/Bonus | 150.00 | 150.00 | 250.00 | 150.00 | 250.00 | 250.00 |
| Salaries - Management | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Payroll Costs | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| **Total Payroll Expenses** | 11,350.00 | 11,390.00 | 11,640.00 | 11,790.00 | 11,990.00 | 11,940.00 |
| | | | | | | |
| **Operational Expenses** | | | | | | |
| Advertising & Promotion | 680.00 | 680.00 | 680.00 | 680.00 | 680.00 | 680.00 |
| Allowance for Bad Debt | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Auto & Gasoline Expense | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| Boat Maintenance | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| Computer Expense | 235.00 | 235.00 | 235.00 | 235.00 | 235.00 | 235.00 |
| Dock Repair | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Employee Meals / Relations | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 |
| Equipment Rental | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 |
| Gardening & Landscaping | 900.00 | 1,000.00 | 1,100.00 | 1,200.00 | 1,300.00 | 1,300.00 |
| Lake Expense | 6,250.00 | 6,250.00 | 6,250.00 | 6,250.00 | 6,250.00 | 6,250.00 |
| Laundry Expense | | | | | | |
| Labor Screening Services | - | - | - | - | | - |
| Minor Equipment | - | - | - | - | - | - |
| Newsletter Expense | - | | - | | - | - |
| Office Expense | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 |
| Other Expenses | 825.00 | 825.00 | 825.00 | 825.00 | 825.00 | 825.00 |
| Repair & Maintenance - General | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Repair & Maintenance - Pool | 500.00 | 500.00 | 500.00 | 500.00 | 1,000.00 | 1,000.00 |
| Supplies | 175.00 | 175.00 | 175.00 | 175.00 | 175.00 | 175.00 |
| Telephone | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 |
| Uniforms Expense | - | | - | - | - | |
| Utilities | 3,200.00 | 3,700.00 | 3,500.00 | 4,700.00 | 5,500.00 | 4,000.00 |
| **Total Operational Expenses** | 21,115.00 | 21,715.00 | 21,615.00 | 22,915.00 | 24,315.00 | 22,815.00 |
| | | | | | | |
| **TOTAL EXPENSES** | 32,465.00 | 33,105.00 | 33,255.00 | 34,705.00 | 36,305.00 | 34,755.00 |
| | | | | | | |
| **OPERATING MARGIN** | 37,070.00 | 37,030.00 | 36,530.00 | 35,680.00 | 34,980.00 | 35,580.00 |
| | | | | | | |
| **FIXED COSTS** | | | | | | |
| Amortization & Depreciation* | | | | | | |
| Capital Reserve | 4,589.31 | 4,628.91 | 4,605.81 | 4,645.41 | 4,704.81 | 4,642.11 |
| Insider Compensation | 3,333.00 | 3,333.00 | 3,333.00 | 3,333.00 | 3,333.00 | 3,333.00 |
| Corporate Salaries | 3,867.00 | 3,867.00 | 3,867.00 | 3,867.00 | 3,867.00 | 3,867.00 |
| Insurance - General & Auto | 2,100.00 | 2,100.00 | 2,100.00 | 2,100.00 | 2,100.00 | 2,100.00 |
| Mortgages (Rec Center & Quail Restaurant) | 6,250.00 | 6,250.00 | 6,250.00 | 6,250.00 | 6,250.00 | 6,250.00 |
| Legal & Accounting | 7,250.00 | 7,250.00 | 7,250.00 | 7,250.00 | 7,250.00 | 7,250.00 |
| Property Taxes | 4,225.00 | 4,225.00 | 4,225.00 | 4,225.00 | 4,225.00 | 4,225.00 |
| Taxes & Licenses | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| U.S. Trustee Fees | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 |
| **TOTAL FIXED COSTS** | 32,664.31 | 32,153.91 | 32,130.81 | 32,170.41 | 32,229.81 | 32,167.11 |
| | | | | | | |
| **TOTAL NOI** | 4,405.69 | 4,876.09 | 4,399.19 | 3,509.59 | 2,750.19 | 3,412.89 |

* Not an actual expense

| In re: | CHAPTER 11 |
|---|---|
| **CITIZENS DEVELOPMENT CORP.,** | |
| Debtor(s). | **CASE NO. 10-15142-LT11** |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067.

A true and correct copy of the foregoing document described as: **DEBTOR'S MOTION FOR ORDER AUTHORIZING FURTHER USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MATTHEW C. DINOFIA IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 15, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Ron Bender    rb@lnbyb.com
- Judith A. Descalso    descalso@pacbell.net
- Philip J Giacinti    pjg@procopio.com, caw@procopio.com;laj@procopio.com
- Haeji Hong    Haeji.Hong@usdoj.gov, USTP.Region15@usdoj.gov;shannon.m.vencill@usdoj.gov;tiffany.l.carroll@usdoj.gov
- Raffi Khatchadourian    raffi@hemar-rousso.com
- Dean T. Kirby    dkirby@kirbymac.com, jrigg@kirbymac.com;gsparks@kirbymac.com;rrobinson@kirbymac.com;jcastranova@kirbymac.com;jlewin@kirbymac.com
- Christina Melhouse    cm@ldplaw.com
- Krikor Meshefejian    kjm@lnbyb.com
- Andrew S. Pauly    apauly@gpfm.com
- Richard J. Pekin    rpekin@foxjohns.com
- Wayne R. Terry    wterry@hemar-rousso.com, mgranzow@hemar-rousso.com
- Kelly Ann Mai Khanh Tran    ktran@mkblaw.com, ssandbeck@mkblaw.com
- United States Trustee    ustp.region15@usdoj.gov
- Dennis J. Wickham    wickham@scmv.com, havard@scmv.com
- Alan Steven Wolf    wdk@wolffirm.com;faxes@wolffirm.com

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**: On **February 15, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service and/or by attorney service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

***By Overnight Mail***
Hon. Laura S. Taylor
U.S. Bankruptcy Court
Jacob Weinberger U.S. Courthouse
325 West F Street, Room 129
San Diego, CA 92101-6998

[X] Service list attached

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

*None.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 15, 2011 | Stephanie Reichert | */s/ Stephanie Reichert* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

## II. SERVED BY U.S. MAIL:

Acushnet/Titlest
P.O. Box 88112
Chicago, IL 60695-1112

Bank Of America
P.O. Box 15731
Wilmington, DE 19886-5731

Liz Tuquero
Bank Of The West
180 Montgomery Street, 25th Floor
San Franisco, CA 94279-8006

CA State Board Of Equalization
P.O. Box 942879
Sacramento, CA 94279-8006

California Credit Union
701 N. Brand Blvd, 3rd Floor
Glendale, CA 91203

Dept Of Water Resources
P.O. Box 942836
Sacramento, CA 94236-0001

El Toreador Property Group/J. Serhan
c/o Wm. J. Caldarelli, Esq.
550 West. C Street, Ste 700
San Diego, CA 92101

Foley & Lardner LLP
555 South Flower Street
Suite 3500
Los Angeles, CA 90071-2411

German American Capital Corporation
60 Wall Street, 10th Floor
New York, NY 10005

Haineslaw
Laurence F. Haines, Esq.
139 East Third Ave., Ste. #108
Escondido, CA 92025

Jani-King Of California, Inc.-SDO
File 749318
Los Angeles, CA 90074-9318

Kitabayashi Design Studio
1227 J Street
San Diego, CA 92101

Ron Frazar
P.O. Box 4970
Whitefish, MT 59937

San Diego County Treasurer-
Tax Collector
P. O. Box 129009
San Diego, CA 92112

Steve I. Kastner, Esq.
101 West Broadway, #1700
San Diego, CA 92101

Tig Global LLC
14851 Collections Center Dr
Chicago, IL 60693

Vallecitos Water District
201 Vallecitos De Oro
San Marcos, CA 92069-1453

Vanorsdale Insurance Services
4909 Murphy Canyon Rd Ste 510
San Diego, CA 92123

Worldwide Payment Systems S.A.
Torneo, 72
41002 Sevilla. **SPAIN**

Mainfest Funding Services
PO Box 790448
St. Louis, MO 63179

Eric Dean
The Wolf Firm
2955 Main Street, 2nd Floor
Irvine, CA  92614

William J. Caldrelli
Mazzorella Caldarelli LLP
550 West C Street
Suite 700
San Diego, CA  92101

Mulvaney, Kahan & Barry LLP
Everett G. Barry, Jr., Esq.
Kelly Ann Tran, Esq.
401 West A Street, 17th Floor
San Diego, CA  92101-1010

Gordon L. Gerson/Jana M. Beck
Gerson Law Firm APC
9255 Towne Centre Drive, Suite 300
San Diego, CA 92121

Chris Dinofia
1710 S. El Camino Real, #E204
Encinitas, CA  92024

Citicapital Commercial Corp.
3950 Regent Blvd.
Irving TX 75063-0000

Citicapital Commercial Leasing Corp.
3950 Regent Blvd.
Irving TX 75063-0000

4750

D&A Semi-Annual Mortgage Fund Iii
10251 Vista Sorrento Parkway
Suite 200
San Diego CA 92121-0000

Javier Serhan
530 B Street
Suite 1530
San Diego CA 91311-0000

Pacific West Realty Group
2550 5th Avenue, Suite 529
San Diego CA 92103-0000

Telesis / Business Partners
Commercial Loan Dept
9301 Winnetka Ave
Chatsworth CA 92101-0000

US Bancorp
P.O. Box 580337
Minneapolis MN 55458-0000

Office of The United States Trustee
402 W. Broadway, Suite 600
San Diego, CA 92101-8511

4750